RENDERED: MAY 7, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NOS. 2019-CA-0983-MR
AND
2019-CA-1057-MR

DECEMBER FARM                               APPELLANT/CROSS-APPELLEE
INTERNATIONAL, LLC

APPEAL AND CROSS-APPEAL FROM SCOTT CIRCUIT COURT
v.            HONORABLE BRIAN PRIVETT, JUDGE
ACTION NO. 09-CI-0608

DECEMBER ESTATE, LLC                        APPELLEE/CROSS-APPELLANT

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: JONES, MAZE, AND TAYLOR, JUDGES.

JONES, JUDGE: Appellant December Farm International, LLC, ("the Farm")

appeals the order of the Scott Circuit Court granting summary judgment to

December Estate, LLC, ("the Estate") on a breach-of-contract claim concerning the

2007 relocation of an easement across the Estate's property.

The Farm appealed, raising numerous issues of error by the circuit court. Having reviewed the record, and being otherwise sufficiently advised, we reverse and remand for further proceedings in accordance with this Opinion for reasons more fully explained below.

## I. STATEMENT OF THE FACTS

This ten-year litigation arises from an Access and Utility Easement Agreement (hereinafter referred to as the "Easement Agreement") for the Farm's benefit. In the spring of 2006, Nicole Hammond, the principle and sole member of the Farm, entered into a contract for the purchase of three adjoining tracts of real estate totaling roughly 456 acres in Scott County, Kentucky. Hammond did not have the financial ability to pay the approximately $2.5 million asking price, nor did she need the entire acreage for the Farm, so she proposed a deal to her acquaintance, Bruce Davis, who in turn proposed the deal to his business partner, Michael Milea.[1]

The terms of the proposal involved Hammond assigning her right to purchase two parcels of the real estate in question to the Estate and, because the remaining 130-acre parcel was essentially "landlocked," the Estate simultaneously granting the Farm an easement across the Estate's property. The Estate agreed to

_____

[1] Davis and Milea eventually formed the Estate, although neither individual is currently associated with the Estate in any capacity.

the proposal, and the two parties negotiated and executed a series of related

agreements on October 31, 2006, including an Assignment and Assumption and

Partial Assignment and Assumption of Purchase and Sale Agreements, by which

the Farm assigned its right to purchase two of the tracts of land to the Estate, and

and Easement Agreement, by which the Estate granted the Farm an easement

across the two tracts of land purchased by the Estate.[2]

Pursuant to the Easement Agreement, the Estate had the authority to

relocate or modify the road at the Farm's sole expense after providing the Farm

with written notice and granting the Farm a three-month period during which to

construct the relocated road itself.  In relevant part, Paragraph 8 of the Easement

Agreement provides:

> a. Notwithstanding anything else set forth in this
> Agreement, [the Estate], in [the Estate's] sole discretion,
> reserves the right to modify or relocate, at [the Farm's]
> sole expense, the Private Drives, Access Easement, the
> Utility Facilities and/or the Utility Easement, from time
> to time on a temporary or permanent basis, provided such
> modification or relocation does not prevent ingress and
> egress to and from the Parcel 9 to a publicly dedicated
> right of way and does not cause an interruption of utility
> service to Parcel 9 (other than a temporary interruption
> resulting from the disconnection and re-connection of the
> Utility Facilities).  It is agreed that the Access Easement

---

[2] Shortly before closing, it became clear that Hammond would need approximately an additional $75,000.00 to close on her farm purchase, so the Estate agreed to lend her $78,000.00.  In return, she executed a promissory note secured by a mortgage for that amount.  With the Note and related agreements, the parties consummated their respective real estate transactions and purchased the adjoining properties in Scott County.

may be relocated to provide access to either Ironworks Pike,[3] Scott County, Kentucky or Lantern Trail, Scott County, Kentucky. *Within three (3) months from written notice to [the Farm] of such relocation, [the Farm], at [the Farm's] sole expense, shall construct the relocated Private Drives and the Utility Facilities in the relocated Access Agreement and Utility Easement.* Such relocated Private Drives and Utility Facilities shall comply with all applicable laws, rules, regulations and ordinances and the requirements of applicable utility companies. . . . *In the event [the Farm] does not construct the relocated Private Drives and Utility Facilities within such three (3) month period, [the Estate] shall have the right to do so, and [the Farm] shall immediately reimburse [the Estate] for the cost thereof. Any amounts not reimbursed to [the Estate] within twenty (20) days after demand for reimbursement shall accrue interest at the rate of twelve percent (12%) per annum.*

b. Notwithstanding anything else set forth in this Agreement, [the Estate] further reserves the right to specifically locate and describe the Access Easement and the Utility Easement.

c. Upon such relocation or location, Grantor is hereby authorized to and shall solely and unilaterally amend this Agreement and shall file such amendment in the Scott County Clerk's office for the purpose of describing the specific location of the relocated or located Private Drives, Access Agreement, the Utility Facilities and/or the Utility Easement shall be terminated with respect to all areas outside the specific Access Agreement and/or Utility Easement. *The width of the relocated and/or located Access Easement shall be the minimum width required by the applicable government authority or utility company* for the Private Drives or Utility Facilities, as applicable.

---

[3] It appears that the reference to Ironworks Pike is a mistake – that portion of the roadway bordering the Estate's property is actually named Ironworks Road.

d. So long as [the Farm] has not constructed the relocated Private Drives as contemplated in <u>Paragraph 8.a</u> of this Agreement and in the event [the Farm] obtains an access, ingress and egress easement for pedestrians, motor vehicles (including without limitation commercial, non-commercial, and trailers attached thereto) and horses on a lead accompanied by a handler, to Muir Lane, the Access Agreement shall terminate upon the recording of an agreement granting [the Farm] access to Muir Lane . . . .

R. at 415-16 (emphasis added).

The original easement followed a preexisting old farm road on the Estate's land from Ironworks Road to the Farm's parcel of land. That road, which for approximately half its length consisted of two tire tracks through fields, was expressly accepted as an adequate right of way to the Farm's property in the Easement Agreement, and a map of that route was incorporated by reference as Exhibit "C" to the Easement Agreement.

In the summer of 2007, as the Estate began developing its property into a residential community, it became necessary to relocate the Farm's easement across the Estate's property. The Estate received a bid from Woodford Excavation and Transport ("WET"), a company owned and operated by Galen Young. WET had previously performed considerable work for the Farm, including building gravel roads in 2006. On March 5, 2007, WET provided the Estate with a written estimate for the construction of the new access road for the Farm. Aside from being more lineal feet of driveway, WET's proposal to the Estate was identical to

its 2006 quotes for the Farm. WET's 2007 estimate for the Estate provided for the excavation of the new roadway and the installation of an eight-inch stone base over the estimated length of 3,800 lineal feet by fourteen-feet wide. The estimate anticipated the need for 6,000 square yards of gravel at the same $9.00 per square yard totaling $54,000.00 and an additional $12,000.00 for grubbing the proposed gravel roadway.

WET faxed a copy of the estimate to the Farm that same day. A handwritten note at the bottom of the Fax Cover Sheet states that it was "[s]ent to Nicole [Hammond] in [sic] behalf of Bruce." WET sent its estimate to Hammond at the same fax number it used to send prior estimates and invoices for work that it had performed for the Farm and received a confirmation sheet denoting successful transmission. Hammond denies receiving the estimate or even knowing the estimated cost of the road prior to its construction, although the fax was produced by the Farm during discovery. Hammond admitted that, in or around spring or summer of 2007, Davis "orally notified [her] that the road would be constructed."

WET performed the work as quoted, excavating the land to create the new access road and installing gravel to the specifications provided. The only difference was an additional $1,400.00 worth of clearing and grubbing that was approved by Davis. WET submitted its bill, which included the change order, totaling $56,600.00, and, on August 7, 2007, the Estate paid the bill.

In September 2007, the Estate unsuccessfully sought reimbursement from the Farm for the relocated road. In January 2008, Milea attempted to set up a meeting with Hammond in a series of emails. The two finally met on February 13, 2008, at which time Milea requested the reimbursement of the $56,600.00 that the Estate paid WET for the relocated easement and the $78,000.00 promissory note due on or before May 31, 2007.

The following day, Milea emailed Hammond: "It was good to see you yesterday. Please let me know when it is convenient for you to make the loan and road payments." R. at 492. On February 29, 2008, Milea emailed Hammond a proposed payoff date of March 3, 2008. Milea and Hammond, as well as Hammond's banker, then exchanged additional emails in which Hammond requested the payoff amount for the promissory note but refused to respond to Milea's repeated requests for a proposed payment timeline for the easement relocation reimbursement. On March 14, 2008, Milea wrote his final email to Hammond, saying: "It has been one month since we discussed this matter . . . We [would] appreciate if you [would] resolve a timeline for the road payment ASAP as you know it is past due . . . We look forward to hearing from you soon." There is no evidence in the record that Hammond ever responded.

On July 17, 2009, following the Farm's refusal to reimburse the Estate for the 2007 relocation, the Estate filed suit, raising a single breach of contract

claim. The Farm answered, asserting a counterclaim seeking setoff for costs incurred by the Farm to repair the easement road. The Farm alleged that it had notified the Estate multiple times throughout the easement's construction that WET was not constructing the road in accordance with alleged industry standards, resulting in a number of quality issues. R. at 20-22.

Specifically, the Farm alleged that the relocated easement was routinely flooding and was not sufficient to be used by commercial vehicles and trailers. WET had not installed any culverts, which Hammond testified caused at least one section of the road to become "completely flooded." Hammond claimed she had telephoned Davis to complain about issues with the relocated easement during its construction: a turn in the road was too narrow for a horse trailer to navigate correctly, the road contained a sunken area that was "flooding consistently," and WET had failed to install the necessary drainpipes. Hammond testified that she had advised Davis not to pay the bill because WET had not completed the work correctly. Hammond claimed that she had attempted to address her concerns with WET multiple times throughout the easement's construction, including the need to install culverts where there was "obvious flooding."

Two years later, in 2009, Hammond engaged her own contractor, Gary Ammerman, to widen the turn, set down more rock, fill the section of road

that was flooding, and install a culvert. Ammerman testified that Hammond initially called him about ponding and washouts on the road and widening the turn. A few weeks later, Ammerman received a call from Hammond about an emergency request that he perform the repairs immediately because the horse trailers were having to drive through standing water, submerging the trailers' brakes and bearings. Ammerman obliged, installing fabric over the gravel in a low area of the road, adding six to eight inches of gravel on top of what WET had already placed, widening two corners of the road, and fixing a ditch to prevent water from collecting. Hammond testified that, until Ammerman's repairs were complete, she could not use the relocated road because "it was flooding, and the turn wasn't wide enough" to navigate with a trailer.

From the time the Farm's answer was filed in August 2009 to February 2014, little progress was made in the case. The case then sat virtually dormant for another two years until the Estate retained new counsel in March 2016. Promptly thereafter, the Estate took Hammond's deposition and moved the Scott Circuit Court to set a trial date, which the parties continued by agreed order.

In the spring of 2017, the Estate determined that it was again necessary to relocate the easement. On or about May 18, 2017, the Estate sent the Farm a written relocation notice informing the Farm that it had elected to relocate the Private Drive, Access Easement, Utility Facilities, and the Utility Easement,

and that, pursuant to the terms of the Easement Agreement, the Farm was required to construct the new Private Drive and new Utilities Facilities within three months. The relocation notice specifically referenced the Estate's authority to relocate the easement as provided by Paragraph 8.a of the Easement Agreement, attached a general map of the relocated easement, and directed the Farm to contact Thoroughbred Engineering for the specific geographical delineation and limitations of the land.

Despite this, the Farm did not construct the new Private Drive and Utility Facilities within the requisite three months. When the Farm finally responded to the Estate by counsel, its counsel challenged the validity of the relocation notice and raised a number of objections. Subsequently, on September 1, 2017, the Estate filed an amended complaint alleging a second breach of contract. The Farm answered the Estate's first amended complaint on September 20, 2017, specifically alleging that the written notice regarding the 2017 relocation was insufficient to trigger any duties of the Farm under the Easement Agreement.

On August 27, 2018, the Estate filed a motion for partial summary judgment regarding the Farm's liability on the 2007 and 2017 easement relocations. In particular, the Estate argued that the Farm had abandoned its claim to setoff for failure to reassert setoff as an affirmative defense and that the Farm's admission that the Estate had relocated the easement "pursuant to its authority"

constituted a judicial admission that the Estate had abided by the terms of the contract. The Estate maintained that the Farm had breached the Easement Agreement by failing to reimburse the Estate for the first relocation and that the Farm's defenses about the quality of the road and the reasonableness of its cost were immaterial under the terms of the Easement Agreement.

On August 28, 2018, the Farm moved to amend its answer to the Estate's first amended complaint seeking to incorporate its original answer and reassert its setoff counterclaim. On September 10, 2018, the Farm responded to the Estate's motion for partial summary judgment. The Farm argued that the Estate's characterization of the 2007 road was not a "relocation" under the Agreement, negating any obligation of reimbursement; that the Estate had not provided the contractually required written notice and three-month window; that there were issues of fact regarding whether the 2007 road met the requirements of the agreement; and that there were issues of material fact as to the Farm's right to setoff. The Farm relied in part upon a post-deposition affidavit from Ammerman alleging that the road as built should have cost $15,188.00 or, if constructed properly, $16,638.00.

On September 12, 2018, the circuit court stated during a hearing that it would deny the Farm's motion for leave to file an amended answer. Although the circuit court granted a summary declaratory judgment in favor of the Estate on the

second relocation, the circuit court initially denied summary judgment for liability on the first relocation.

On October 11, 2018, the Estate filed a motion to reconsider regarding the 2007 relocation, which the circuit court granted without further explanation. On October 25, 2018, the circuit court denied the Farm's motion to alter, amend, or vacate the granting of declaratory judgment for the Estate on the second relocation, granted the Estate's motion to strike Ammerman's post-deposition affidavit, and set a hearing for the Estate's motion for summary judgment as to remedies. In the interim, the Estate filed a motion for summary judgment regarding the award of appropriate remedies as related to the 2007 easement. A week after the deadline for filing its response, the Farm sought leave to file a late response to that motion, which the circuit court denied as untimely and unfounded. The circuit court heard arguments on November 1, 2018.

On May 31, 2019, the circuit court entered an opinion and order granting the Estate damages totaling $189,658.68 for the 2007 relocation – $56,000.00 in the amount the Estate paid to WET to construct the easement plus $133,058.68 in prejudgment interest at the contractual rate of 12% for the ten-year period from March 5, 2008, to November 1, 2018. By agreed order entered on June 13, 2019, the circuit court's May 31, 2019, opinion and order was made final and appealable.

This appeal and cross-appeal followed.

## II.    STANDARD OF REVIEW

"[S]ummary judgment is to be cautiously applied and should not be used as a substitute for trial" unless "there is no legitimate claim under the law and it would be impossible to assert one given the facts." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 483 (Ky. 1991); *Shelton v. Kentucky Easter Seals Soc'y, Inc.*, 413 S.W.3d 901, 916 (Ky. 2013). A motion for summary judgment should be granted "[o]nly when it appears impossible for the nonmoving party to produce evidence at trial warranting a judgment in his favor" even when the evidence is viewed in the light most favorable to him. *Steelvest*, 807 S.W.2d at 482; *see also Shelton*, 413 S.W.3d at 905. To survive a properly supported summary judgment motion, the opposing party must have presented "at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Steelvest*, 807 S.W.2d at 482; *see also Neal v. Welker*, 426 S.W.2d 476, 479 (Ky. 1968) ("When the moving party has presented evidence showing that . . . there is no genuine issue of any material fact, it becomes incumbent upon the adverse party to counter that evidentiary showing by some form of evidentiary material reflecting that there is a genuine issue pertaining to a material fact.").

"The standard of review on appeal of a summary judgment is whether the trial court correctly found that there were no genuine issues as to any material

fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996) (citing CR[4] 56.03). Because there are no factual findings at issue, the appellate court may review the trial court's decision *de novo*. *Shelton*, 413 S.W.3d at 905.

## III. ANALYSIS

The Farm raises a number of issues on appeal: (1) whether the circuit court erred in granting summary judgment regarding the 2007 easement; (2) whether the circuit court erred in dismissing the Farm's setoff counterclaim; (3) whether the circuit court erred in striking Ammerman's post-deposition affidavit; and (4) whether the circuit court abused its discretion in awarding the Estate prejudgment interest. The Estate raised a single issue on cross-appeal: whether the circuit court miscalculated the award of prejudgment interest based upon the Estate's own calculations.

The Farm alleged for the first time at summary judgment that the Estate did not comply with the Easement Agreement's written notice requirements, thereby failing to trigger the Farm's obligation to reimburse the Estate for the relocated easement. It appears that the circuit court deemed the Farm's condition precedent argument waived either for failure to assert it as an affirmative defense or by judicial admission. We disagree with the circuit court on both counts.

---

[4] Kentucky Rules of Civil Procedure.

"'Condition precedent' is a legal term of art with a clear meaning: 'An act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises.'" *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 785 (Ky. 2017) (quoting *BMD Contractors, Inc. v. Fid. & Deposit Co.*, 679 F.3d 643, 650 (7th Cir. 2012) (citing *Condition Precedent*, BLACK'S LAW DICTIONARY (11th ed. 2019)). Kentucky law does not favor conditions precedent, and our courts will not construe them as such "unless required to do so by plain, unambiguous language or by necessary implication." *A. L. Pickens Co. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 121 (6th Cir. 1981) (quoting 17 AM. JUR. 2d *Contracts*, § 321 (Supp. 1980)); *see Mock v. Trustees of First Baptist Church of Newport*, 252 Ky. 243, 67 S.W.2d 9, 11 (1934).

Here, Paragraph 8.a of the Easement Agreement is unambiguous regarding the Estate's contractual obligations to trigger the Farm's duty to pay. Under the terms of the Easement Agreement, the Estate was to provide written notice to the Farm of its intent to relocate the easement. Upon receipt of that notice, the Farm shall have three months to construct the relocated easement at its sole expense. Only after written notice and the passing of three months shall the Estate have the right to construct the road and seek reimbursement from the Farm.

"[A] party seeking to enforce specific performance usually has the burden of proving that he has complied with its terms, or that he is ready, able, and willing to perform his obligations under the contract, in their entirety, and to do whatever has been made a condition precedent on his part." *Kuntz v. Peters*, 286 Ky. 227, 150 S.W.2d 665, 667 (1941) (citation omitted); C.J.S. *Contracts* § 952 (2021) ("The party alleging the breach of contract and seeking to enforce the contract bears the burden of proof that the condition precedent was satisfied. The burden rests on the plaintiff to show the fulfillment of a condition precedent to the right of recovery."). "[T]he performance [of a condition precedent] must be stated, or a waiver pleaded, or excuse given for noncompliance." *Louisville & N.R. Co. v. Home Fruit & Produce Co.*, 310 Ky. 269, 220 S.W.2d 558, 560 (1949) (holding that "[w]hen the petition fails to state facts sufficient to constitute a cause of action, unless the defect is cured by an answer, the defendant is entitled to a judgment notwithstanding the verdict.").

CR 9.03, which governs the pleadings of conditions precedent under Kentucky law, provides: "In pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred. A denial of performance or occurrence shall be made specifically and with particularity." Therefore, it is incumbent upon the plaintiff to plead generally the performance of any conditions precedent as an element of his

-16-

claim. A complaint that fails to allege performance of condition precedent when that performance is essential to recovery fails to state a cause of action. *Home Fruit*, 220 S.W.2d at 560.

Neither the Estate's complaint nor its first amended complaint contains the allegation that the Estate satisfied the Easement Agreement's written notice requirement in 2007, although the Estate does plead specifically and in detail that it complied with the written notice requirements in 2017. Nevertheless, "Kentucky is a notice pleading jurisdiction, where the 'central purpose of pleadings remains notice of claims and defenses.'" *Pete v. Anderson*, 413 S.W.3d 291, 301 (Ky. 2013) (quoting *Hoke v. Cullinan*, 914 S.W.2d 335, 339 (Ky. 1995)). "A pleading which sets forth a claim for relief . . . shall contain (a) a short and plain statement of the claim showing that the pleader is entitled to relief and (b) a demand for judgment for the relief to which he deems himself entitled." CR 8.01(1). "It is not necessary to state a claim with technical precision under this rule, as long as a complaint gives a defendant fair notice and identifies the claim." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005) (citing *Cincinnati, Newport & Covington Transp. Co. v. Fischer*, 357 S.W.2d 870, 872 (Ky. 1962)). Moreover, "[a]ll pleadings shall be so construed as to do substantial justice." CR 8.06. Accordingly, the Estate's complaint is sufficient to provide the Farm notice of its breach-of-contract claim.

Likewise, the Farm's answer does not accord with CR 9.03, as it does not specifically deny that the Estate failed to provide the requisite written notice. However, neither does it waive that obligation. "Denials of the fulfillment of a condition precedent shall be made specifically and with particularity. This does not require allegations anticipating defenses, however. CR 9.03 should not be construed as intending to shift the burden of proof." 11 LESLIE W. ABRAMSON, KY. PRAC. CIV. PROC. Forms § 36:18 (2020). The Estate contends, incorrectly, that failure to perform a condition precedent is an affirmative defense that must be pled or be considered waived. We disagree.

An affirmative defense is a "defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." *Affirmative Defense*, BLACK'S LAW DICTIONARY (11th ed. 2019). "As a general rule, a party's failure to timely assert an affirmative defense waives that defense." *Am. Founders Bank, Inc. v. Moden Investments, LLC*, 432 S.W.3d 715, 722 (Ky. App. 2014) (citing CR 8.03; *Bowling v. Kentucky Dept. of Corrections*, 301 S.W.3d 478, 485 (Ky. 2009)). CR 8.03 provides a non-exhaustive list of affirmative defenses, but notably, performance or occurrence of a condition precedent is not one of them.

The Farm relies upon *American General Life Insurance Company v. Estate of Chad Jude*, No. 17-90-DLB-EBA, 2019 WL 2193850, at *4 (E.D. Ky.

-18-

May 21, 2019), *aff'd in part, rev'd in part, and remanded sub nom. American General Life Insurance Company v. Estate of Jude*, 825 F. App'x 261 (6th Cir. 2020), for the proposition that FRCP[5] 9(c) "does not, however, 'impose an obligation on plaintiffs to plead the performance or occurrence of conditions precedent. Rather, it is *the applicable substantive law* that determines whether the performance or occurrence of conditions precedent is an element of the claim' and whether it must be pled." *Id*. (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1303 (4th ed. 2018)). In that case, the district court noted that, in breach-of-contract actions, "a plaintiff must generally plead 'that it performed all contractual conditions required of it' before bringing suit." *Id*. at *5 (quoting *Byczek v. Boelter Co., Inc.*, 264 F. Supp. 2d 720, 723 (N.D. Il. 2003)). Because pleading a condition precedent is the plaintiff's burden and is in fact an essential element of a plaintiff's breach-of-contract claim, failure to satisfy a condition precedent is not an affirmative defense that must be pled or considered waived.

In this case, the Estate claims that condition precedent had not been raised as an issue until summary judgment. This is incorrect – the subject was raised, albeit briefly, during Hammond's deposition when she testified regarding WET's fax and complained that she ought to have had a chance to select who she

---

[5] Federal Rules of Civil Procedure.

-19-

wanted to perform the easement construction herself. The Estate could not have been blindsided by the Farm's condition precedent defense given this testimony.

Moreover, we disagree with the Estate's alternative contention that the Farm waived its condition precedent defense by judicial admission. A judicial admission is a formal act by a party in the course of a judicial proceeding which has the effect of waiving or dispensing with the necessity of producing evidence by the opponent and bars a party from disputing a proposition in question. *Center v. Stamper*, 318 S.W.2d 853, 855 (Ky. 1958). For a statement to qualify as a judicial admission, it must be conclusive, "narrowly construed," and "remove[] the proposition in question from the field of disputed issue[.]" *Witten v. Pack*, 237 S.W.3d 133, 136 (Ky. 2007); *Sutherland v. Davis*, 286 Ky. 743, 151 S.W.2d 1021, 1024 (1941).

The Farm admitted several allegations in the Estate's first amended complaint, including that the Estate "exercised its authority to relocate the Access Easement" and acted "pursuant to its authority" under the Easement Agreement. R. at 110, 112. According to the Estate, these constitute judicial admissions that the Estate complied with Paragraph 8.a of the Easement Agreement. However, we determine that such statements are not conclusive enough to constitute dispositive admissions, particularly when the Farm asserted that the Estate's recovery is barred because the Estate "breached the contract first." R. at 151. There is a difference

between having authority under a contract and using that authority in compliance with the terms of that contract.

Having established that the Farm did not waive its condition precedent argument, we conclude that there remain genuine issues of material fact. Hammond's allegations that the Farm did not receive WET's fax, and even if it did, that the fax was not sufficient notice under the terms of the agreement, present issues of fact.[6]  Then there is the issue of whether the Estate failed to provide the Farm with a three-month waiting period during which the Farm could construct the new easement itself or whether Hammond waived the Estate's failure to comply with the Easement Agreement.  *Bates v. Grain Dealers Nat'l Mut. Fire Ins. Co.*, 283 S.W.2d 3, 5 (Ky. 1955) ("[Waiver] may be express or it may be inferred from the acts or conduct of a party."); *see also Cent. Life Ins. Co. v. Roberts*, 165 Ky. 296, 176 S.W. 1139 (1915) (holding that an insurance contractual provision may be impliedly waived by a party's conduct).  Hammond's testimony that she "should have had the opportunity to choose who [she] wanted to [construct the road]" demonstrates that there is a question of fact regarding whether the Estate

---

[6] The Estate briefly argues that the Farm had actual notice of the relocation, rendering whether the Farm veritably received written notice immaterial.  This is incorrect.  Because "a written instrument will be strictly enforced according to its terms[,]" the Estate is beholden to the specific provision within the Easement Agreement requiring notice to be given in writing.  *Yeager v. McLellan*, 177 S.W.3d 807, 809 (Ky. 2005).  Under the terms of the Easement Agreement, oral notice is not sufficient to satisfy the Estate's contractual obligation to provide written notice.

provided Hammond with a three-month waiting period. R. at 556-57. Hammond also testified that she actively engaged with WET's construction of the easement by voicing her concerns to Davis and WET, raising the question of whether the Farm waived any failure on the Estate's part.

"Kentucky law clearly holds that if a condition precedent is not satisfied, the contract in question is not enforceable." *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 734 (Bankr. W.D. Ky. 1998), *aff'd*, 233 B.R. 739 (W.D. Ky. 1998) (citing *Collings v. Scheen*, 415 S.W.2d 589 (Ky. 1967). Accordingly, we reverse the circuit court's judgment regarding the issue of condition precedent and remand for further proceedings.

The next issue on appeal is whether the circuit erred by dismissing the Farm's counterclaim for setoff. After the Estate had filed its motion for partial summary judgment, but still within the deadline imposed by the circuit court for amendments, the Farm moved for leave to file an amended answer to the Estate's first amended complaint. In part, the Farm sought to reassert its counterclaim of setoff, which the Estate averred was waived. We presume from the record the circuit court rejected this motion having assumed that setoff was waived when it was not reasserted in the Farm's answer to the Estate's first amended complaint.

Contrary to the Estate's assertion, setoff is not an affirmative defense that must be pled or otherwise waived. Like condition precedent, setoff is not an

affirmative defense listed in CR 9.03. Federal courts, which operate under the substantially similar Federal Rule of Civil Procedure 8, recognize that setoff may be properly raised as either an affirmative defense or a counterclaim. *Minnesota Elevator, Inc. v. Imperial Elevator Servs., Inc.*, 758 F. Supp. 2d 533, 538 (N.D. Ill. 2010) (holding that setoff must be pleaded as a counterclaim rather than asserted as an affirmative defense); *Ace Hardware Corp. v. Marn, Inc.*, No. 06-CV-5335, 2008 WL 4286975, at *8 (N.D. Ill. Sept. 16, 2008) ("[A] claim for setoff, or recoupment for that matter, is not an affirmative defense because it does not destroy the plaintiff's right of action.").

"Other courts examining the issue have found that failing to assert counterclaims in an answer to an amended complaint after they had already been asserted in response to an earlier complaint does not necessarily constitute abandonment of the counterclaims." *AnTerra Grp. Inc. v. KiVAR Chem. Techs.*, No. SACV 13-00734 JVS(ANx), 2014 WL 12589631, at *3 (C.D. Cal. May 23, 2014) (citing *Davis v. Beaird*, No. 4:10-CV-1429 NAB, 2014 WL 916947, at *3-4 (E.D. Mo. Mar. 10, 2014) (declining to dismiss a counterclaim where the court found no indication of the defendant's intent to abandon it); *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 705-06 (D. Md. 2011) (permitting counterclaims to proceed because they were "indisputably at issue for the majority of the discovery period" and defendant had indicated his intent to pursue the

counterclaims); *Hitachi Med. Sys. Am., Inc. v. Horizon Med. Grp.*, No. 5:07CV02035, 2008 WL 5723531, at *4-5 (N.D. Ohio Aug. 29, 2008) (finding the plaintiff had been on notice of contents of counterclaim which had not changed since initial filing and was not prejudiced the defendant's failure to reassert the counterclaim).[7]  We are likewise persuaded by the Western District of Pennsylvania's analysis of the Federal Rule of Civil Procedure 13, which governs counterclaims:

> Plaintiffs reason that the failure to "reassert" the Counterclaims somehow means that they are no longer viable. . . .  Significantly, the Plaintiffs do not cite to any authority for the proposition that the Defendants were required to reassert the Counterclaims in their Answer to the Amended Comp[l]aint.  Rule 13, which governs counterclaims, requires only that a counterclaim be set forth in a pleading—it does not mandate that it be contained in an answer.  *See* Fed. R. Civ. P. 13(a)-(f). Further, an answer responds to the allegations in a complaint, a counterclaim is something independent. Revisions to a complaint do not require revisions to a counterclaim.

*Dunkin' Donuts, Inc. v. Romanias*, No. CIV.A.00-1886, 2002 WL 32955492, at *2 (W.D. Pa. May 29, 2002).

---

[7] State courts are not bound by the decision of federal courts; "[r]ather, the approach taken by federal courts may be viewed as persuasive but it is not binding." *U.S., ex rel. U.S. Attorneys ex rel. Eastern, Western Districts of Kentucky v. Kentucky Bar Ass'n*, 439 S.W.3d 136, 147 (Ky. 2014).

Here, the Farm filed a counterclaim alleging, in part: "In the event the Court shall determine that no sums are owed to the [Estate] by the [Farm], then the [Farm] is entitled to recover the sums set forth in its Set Off in this Counterclaim." R. at 20. That counterclaim was never withdrawn, and there is no Kentucky Rule of Civil Procedure requiring that it must be reasserted upon the Estate's filing of the first amended complaint. The parties have been aware of the Farm's counterclaim since its filing in 2007, and the issue of setoff has been central to the parties' discovery over the past ten years. There is ample evidence that the Farm intended to pursue its counterclaim, and so we conclude that the Farm has not abandoned its counterclaim.

The Farm maintains that it is entitled to setoff for the money expended to repair the easement because the Estate's first relocation of the easement failed to comply with standards set forth in the Easement Agreement. According to the Farm, the Estate's first relocation of the easement failed to comply with standards set forth in the Easement Agreement found in Paragraph 1 of the Easement Agreement:

> 1. Grant of Access Easement. Subject to Section 8, [The Estate] hereby grants to [the Farm] the benefit of the Parcel 9 a non-exclusive easement for pedestrians, motor vehicles (including without limitation commercial, non-commercial, and trailers attached thereto) and horses on a lead accompanied by a handler, access, and ingress and egress over and across the existing farm road on Parcels 5 and 8. . . . All vehicular traffic over the Access

Easement shall be confined to such existing farm road generally identified on **Exhibit C** (collectively, "the Private Drives") currently located on Parcels 5 and 8, subject to the terms and conditions set forth herein. Upon ten (10) days prior notice to Grantee (unless an emergency exists, in which event as much notice shall be given as reasonably possible). . . .

R. at 413 (emphasis in original).

The Estate asserts that it is actually Paragraph 8.c that dictates the standards of construction for the relocated easement. R. at 416 ("The width of the relocated and/or located Access Easement shall be the minimum width required by the applicable government authority or utility company. . . .").[8] The Estate asserts that under Paragraph 4 of the Easement Agreement, which expressly grants the Farm "the right, subject to the written approval of [the Estate] to improve, maintain or repair the Private Drives . . . at [the Farm's] sole cost and expense," any expenses for additional modifications beyond what is required by the Easement Agreement fall to the Farm. R. at 415.

The parties' differing interpretations suggest that that Easement Agreement may be ambiguous. "[T]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be

---

[8] The Estate's expert witness, Jonathan Hale, testified that "Scott County at this time still does not have any design standards for gravel roads, for properties, for access to properties – less than three or less properties." Hale Depo. at 14-15. According to Hale, "there's no minimum width [requirement] because there are no regulations." *Id*. at 28.

decided by the court." *First Commonwealth Bank of Prestonsburg v. West*, 55

S.W.3d 829, 835 (Ky. App. 2000).

> As such, we first must determine whether the terms of the [contract] are ambiguous because our resolution of the ambiguity question will dictate how our interpretive analysis will proceed. If an ambiguity exists, "the court will gather, if possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written," by evaluating extrinsic evidence as to the parties' intentions. However, "[i]n the absence of ambiguity a written instrument will be enforced strictly according to its terms," and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.

*Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105-06 (Ky. 2003) (footnotes

omitted).

The circuit court's judgment is silent regarding the Easement

Agreement's interpretation, and it did not address any potential ambiguities in the

contract terms. Without the construction standards referenced in Paragraph 8.c, it

is unclear to what specifications that relocated easement must conform. This issue

is one for the circuit court to decide. Accordingly, we find that the circuit court

erred in dismissing the Farm's counterclaim and remand it for proceedings on its

merits.

Our conclusions on the two issues discussed above, largely moot the

parties' other arguments. However, because the issues with respect to the striking

of Ammerman's affidavit and/or pre-judgment interest may arise again on remand, we will briefly address them.

Ammerman's expert witness disclosures provided that Ammerman would testify as to the amount that should have been charged by WET for the road as constructed and the cost of the road had it been properly constructed according to "industry standards," what was wrong with the 2007 road, what he had done to correct the issues, and that the 2007 road constructed by WET should not have cost $56,000. In his June 7, 2018, deposition, Ammerman was asked about his opinions in the case.

> Q: *So you don't have any opinion, I take it, about*
> *whether the work that [WET] performed was too*
> *expensive or not, do you?*
> A: *No.*
> Q: Okay. You do have an opinion about if you had built
> it, what you would charge for it, though?
> A: Right.
> Q: Would you agree that your opinion is not the only
> reasonable opinion about what someone would charge for
> doing that much work?
> A: Right.
> Q: And just because someone else is a higher bidder than
> you wouldn't necessarily mean it would be unreasonable
> to take their bid?
> A: No.

R. at 821-22 (emphasis added).

However, in his post-deposition affidavit, Ammerman opined:

> 2. As stated in the Itemization of Damages, the proper
> amount which should have been charged for labor and

-28-

materials to construct the road as built is $15,188.00. This is based on the road having a total length of 3,300 feet. The rock required is based on the cost at that time (2007) of $6.95 per ton plus $3.50 in hauling costs per ton. The bulldozer labor would have cost $600.00.

3. If the road had been properly constructed, the cost for labor and materials according to industry standards would have been $16,638.00. That sum would have included three drainage culverts at a cost of $150.00 each and $1,600.00 in excavation costs for the drainage culverts and to properly crown the road to ensure water runoff.

R. at 581.

Kentucky courts have also explained that "[t]he discovery of the substance of an expert witness's expected testimony is essential to trial preparation." *Clephas v. Garlock*, 168 S.W.3d 389, 394 (Ky. App. 2004). The overarching "purpose of [CR 26.02(4)(a)] is to allow the opposing party to adequately prepare for the substance of the expert's trial testimony." *Pauly v. Chang*, 498 S.W.3d 394, 412 (Ky. App. 2015). The proper sanction for violating CR 26.02 is the exclusion of the proposed expert testimony. *Id*.

In *Lipsteuer v. CSX Transp., Inc.*, 37 S.W.3d 732, 736 (Ky. 2000), our Supreme Court held that a post-deposition affidavit may not be ignored. "The Kentucky Supreme Court recently noted that '[a]s a general proposition, a deposition is more reliable than an affidavit.'" *Gilliam v. Pikeville United Methodist Hosp. of Kentucky, Inc.,* 215 S.W.3d 56, 62 (Ky. App. 2006) (citation

omitted).  "The rule for the use of a post-deposition affidavit to defeat a summary judgment motion is that the post-deposition affidavit cannot be used to create an issue of material fact by contradicting prior testimony, but can be used to explain prior testimony or resolve inconsistencies in prior testimony."  *Loy v. CSX Transp., Inc.*, No. 2010-CA-00516-MR, 2011 WL 5008081, at *4 (Ky. App. Oct. 21, 2011).

However, counsel may not rely upon "catch-all" questioning in an attempt to limit a witness's testimony.  In *Talley*, opposing counsel asked Talley, the claimant in a wrongful discharge case, "Is there anything else related to your complaint that we haven't discussed that you would like to talk about here today?" *Talley v. MAC Auto Team, LLC*, No. 2015-CA-000453-MR, 2016 WL 4410091, at *2 (Ky. App. Aug. 19, 2016).  Talley's answer was interrupted by counsel, rendering it incomplete, and Talley explained in his post-deposition affidavit that he was "not asked about, nor did [he] testify about" other facts relevant to his claim.  *Id*.  Thus, Talley's affidavit does not "*merely [contradict]* earlier testimony" but "explains why the deposition testimony is incomplete and misleading."  *Id*. at *3.

The Farm relies upon *Talley* for the premise that a "witness's failure to testify about a particular fact does not make a subsequent affidavit clarifying or explaining that fact inconsistent or contradictory."  Appellant's Br. at 28.

-30-

However, we disagree with the Farm's argument that Ammerman's refusal to characterize WET's work as "too expensive" was a purely subjective characterization that did not elucidate his opinion on what the road should have cost as constructed and what the road would have cost had it been constructed "properly." Any opinion about whether that road was "too expensive" as constructed would necessarily speak to how much Ammerman believes the road should have cost. Accordingly, we find that the circuit court exercised appropriate discretion in refusing to consider Ammerman's post-deposition affidavit.

Finally, we address the issue of pre-judgment interest. Our Court has previously upheld the award of both pre-judgment and post-judgment interest "[b]ased upon the plain language of KRS[9] 360.040(3) and KRS 360.010(3), and the express terms of the agreements between the parties." *Hellier Manor Apartments, Ltd. v. City of Pikeville*, 589 S.W.3d 528, 534 (Ky. App. 2018). Under Kentucky law, "[t]he party entitled to be paid in any written contract or obligation specifying a rate of interest shall be entitled to recover interest after default at the rate of interest as is expressed in the contract or obligation prior to the default[.]" KRS 360.010(3). "A judgment rendered on a contract . . . shall bear interest at the interest rate established in that contract[.]" KRS 360.040(3).

---

[9] Kentucky Revised Statutes.

Here, the Easement Agreement provides that, following a relocation of the easement in accordance with the terms of the contract, "[a]ny amounts not reimbursed to [the Estate] within twenty (20) days after demand for reimbursement shall accrue interest at the rate of twelve percent (12%) per annum." R. at 415. The circuit court observed that "[w]ith a clear contractual provision, the Easement Agreement controls under KRS 360.040(3)." R. at 1029. Having awarded summary judgment in favor of the Estate, the circuit court awarded pre-judgment interest at the contractually agreed rate of 12% from March 5, 2008, (twenty days after the Estate's formal demand to the Farm) to November 1, 2018, (the anticipated date of the hearing on this matter and the date referenced in the Estate's calculation of damages) in the amount of $196,299.85. The circuit court then awarded post-judgment interest at the contractually agreed rate of 12% compounded annually beginning on May 31, 2019, the date on which the circuit court rendered its final judgment.

In awarding damages to the Estate, the circuit court concluded that the amount was an unliquidated sum making the decision to award pre-judgment interest discretionary. *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136 (Ky. 1991). When determining whether it would be appropriate to award pre-judgment interest on the unliquidated damages in the present case, it is clear that the circuit court

carefully considered the facts of the case and the terms of the Easement

Agreement:

> [T]he Court finds that the amount owed under the contract is an unliquidated sum. Because the amount owed is not liquidated, pre-judgment interest does not follow as a matter of course under *Nucor Corp.* prior to the contracted-for twenty days following [the Estate's] demand for payment. *Nucor Corp.* does provide, however, that a trial court may use discretion in deciding whether [pre-judgment] interest on an unliquidated claim is appropriate. *See Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136 at 145. The Court has considered and balanced the undisputed facts and equities of this action and finds that it would be inequitable for [the Estate] to recover pre-judgment interest for the period between August 7, 2007 through March 5, 2008 (twenty days after [the Estate's] demand for payment); especially since the Easement Agreement made clear that interest would not begin to accrue until twenty (20) days following the demand for payment.
>
> . . . .
>
> The Court has found that [the Estate] is not entitled to pre-judgment interest prior to twenty days following the demand date, or March 5, 2008, and the Easement Agreement provides and controls the interest rate thereafter. The Easement Agreement provides, in pertinent part, "Any amounts not reimbursed to Grantor within twenty (20) days after demand for reimbursement shall accrue interest at the rate of twelve percent (12%) per annum." Interpreting the Easement Agreement within its four corners, the Court interprets this provision to plainly refer to compounding interest. Accordingly, the Court finds the interest rate to be 12%, compounded annually. . . .
>
> . . . .

-33-

In *Union Trust v. Brown*, 757 S.W.2d 218, 220 (Ky. App. 1988), the Kentucky Court of Appeals found that the trial court erred in awarding the statutory interest rate post-judgment, but the contractual rate of interest pre-judgment. "The stated rates of interest within [contracts] are obligations of contracts. It is therefore constitutionally beyond the general power of government to mandate a particular rate of interest for them or for judgments derived from them.["] *Union Trust, Inc. v. Brown*, 757 S.W.2d 218, 220 (Ky. App. 1988). "The parties negotiated the interest rates and thus both are bound by it." *Id.* Therefore, this Court finds that [the Estate] is entitled to a post-judgment interest equal to that of the contractual interest rate of twelve percent (12%) per annum, or compounded annually, from the date this judgment is entered.

R. at 1031-33.

We disagree that the circuit court abused its discretion. It essentially followed the parties' contract, a contract that was negotiated by the parties, with the assistance of counsel. While the interest is large, the Farm was or should have been aware of the interest provisions it agreed to on the front end, and the amount due is primarily attributable to the parties' inability to move this case forward after it was filed. Having reviewed the record, we do not believe the delay was purposeful or solely the fault of either the court or the Estate. At best, the Farm acquiesced to the delay. It should have known that doing so could work against it in event it was found liable. Upon remand, to the extent the circuit court awards damages upon the 2007 easement claims, those damages would be subject to pre-judgment interest.

-34-

## IV.    CONCLUSION

In light of the foregoing, we reverse the circuit court's summary judgment on the 2007 easement and remand for further proceedings not inconsistent with this Opinion.

ALL CONCUR.

BRIEF AND ORAL ARGUMENT
FOR APPELLANT/CROSS-
APPELLEE:

Michael Meuser
Elizabeth Woodford
Lexington, Kentucky

BRIEF AND ORAL ARGUMENT
FOR APPELLEE/CROSS-
APPELLANT:

Richard Getty
C. Thomas Ezzell
Matthew W. English
Lexington, Kentucky